UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALIYSHA M.A. CLARK,
*Personal Representative of*
*Estate of Ramonta Deshawn Taylor,*

           Plaintiff,                    Case No. 2:25-cv-11387

v.                                Honorable Susan K. DeClercq
                                   United States District Judge

COUNTY OF MONROE, et al.,

           Defendants.

_____/

**ORDER AND OPINION GRANTING DEFENDANTS' MOTIONS TO DISMISS (ECF Nos. 24; 25; 26) AND DECLINING TO EXERCISE SUPPLEMENTAL OVER REMAINING STATE CLAIMS**

A traffic stop for tinted windows ended in a fatal cocaine overdose. Plaintiff Aliysha M.A. Clark, acting on behalf of the deceased individual, Ramonta Deshawn Taylor, alleges that the arresting officer and the officers who received Taylor at the county jail were deliberately indifferent to Taylor's serious medical needs. The officers argue that qualified immunity bars this suit. For the reasons set forth below, this Court finds that Defendants are entitled to qualified immunity, so their motions to dismiss all federal claims will be granted. In addition, this Court will decline to exercise supplemental jurisdiction over the remaining state law claims.

**I. BACKGROUND**

**A. Factual History**

On the afternoon of July 7, 2022, Ramonta Deshawn Taylor died while he was in the custody of the Michigan State Police and the Monroe County Sheriff. ECF No. 1 at PageID.5. That day, at approximately 2:30 p.m., Michigan State Police Trooper Andrew Dayfield stopped Taylor's vehicle because Taylor's window appeared unlawfully tinted. ECF Nos. 1 at PageID.5; 25 at PageID.244. A records check revealed that Taylor had an outstanding warrant for unpaid child support, so Dayfield arrested Taylor and sat him handcuffed in the passenger seat of the patrol vehicle. ECF No. 25 at PageID.245; ECF 25-2–Outward Facing Dashcam Video, at 5:13–8:53.

As shown on dashcam video, while sitting alone in Dayfield's car, and outside of the officer's view, Taylor chews and swallows a baggie of cocaine that he pulled from his back pocket. ECF 24-3–Inward Facing Dashcam Video, at 9:00–14:30 (hereafter "Inward Facing Video"). After a few minutes, Taylor vomits a reddish or pink liquid that lands on his hair and white tank top. *Id.* at 29:19–29:26. Approximately one minute after Taylor vomits, Dayfield enters the car and asks whether Taylor is bleeding, whether he had "puke[d]", and what he had swallowed. *Id.* at 30:16–30:44. While some of his words are hard to understand, Taylor explains that his mouth was bleeding but denies swallowing anything. *Id.* At that point, Dayfield gets out of the car, walks around the vehicle, and opens the passenger side door. *Id.* at 30:49–31:06. Dayfield then asks whether Taylor has anything in his

mouth, whether he needs medical attention, and whether he is bleeding. *Id.* at 31:15. Taylor answers that he had nothing in his mouth and he has blood on his shirt because he had surgery on his tooth. *Id.* at 31:15–31:42. Taylor opens his mouth and assures Dayfield that he has nothing in his mouth. *Id.* Dayfield then closes the door and walks back to the driver's seat, opens the door, and asks Taylor if he needs an ambulance, which Taylor rejects, saying "I tried to spit out the window." *Id.* at 31:40–31:57.

A few minutes later, Taylor's head droops and his eyes close for a few seconds. *Id.* at 33:59–34:04. When Dayfield opens the passenger door, Taylor wakes up and says he is fine. *Id.* He then explains, with some effort, that he had been drinking red pop and that his mouth was bleeding. *Id.* at 34:08–34:19. Dayfield proceeds to read Taylor his *Miranda*[1] rights and asks him about some cut-off straws found in his vehicle. *Id.* at 34:52–36:24. Taylor denies the straws are his. *Id.*

Two minutes later, Taylor coughs and again spits up pink fluid, outside Dayfield's presence. *Id.* at 39:45–39:48. When Dayfield returns, he asks why Taylor keeps spitting. *Id.* at 40:10–40:14. Taylor shows him his mouth again and says it was spit. *Id.* at 40:15–40:23. Dayfield briefly steps away, but when he comes back, he asks Taylor whether he had swallowed anything, and whether an X-ray at the hospital

---

[1] The *Miranda* rights are a set of warnings that police in the United States must give to suspects in custody before interrogation, established by the Supreme Court in *Miranda v. Arizona*, 384 U.S. 436 (1966).

would reveal anything swallowed, to which Taylor answers "no." *Id.* at 40:33–40:38. Dayfield then expresses his discontent with Taylor spitting in his car, to which Taylor responds that he only spat one time and that the window was down, before saying something about his handcuffs and that he could not reach his hands. *Id.* at 40:39–41:12.

Taylor then asks: "What are you doing with me?" but Dayfield exits the vehicle towards the back of the car without answering. *Id.* at 42:07. Taylor drops his head and closes his eyes. *Id.* After a few seconds, Dayfield returns to the front of the car, knocks on the passenger-side window, and opens the door, waking Taylor, who almost immediately says, "What? . . . I'm fine." Dayfield then closes the door and walks towards the back of the car to talk with another officer. *Id.* at 42:08–43:26.

A moment later, Taylor coughs and spits up pink fluid for a third time, again outside Dayfield's view. *Id.* at 44:58–45:00. Seconds after that, Dayfield returns, picks up his phone, buckles his seatbelt, and begins to drive toward the jail. *Id.* at 45:12–45:43. At this point, approximately 30 minutes had passed since Taylor swallowed the cocaine baggie.

A minute later, Dayfield asks Taylor if he is sick, to which Taylor shakes his head. *Id.* at 46:49-46:52. Dayfield asks if Taylor was spitting anything, and expresses confusion over Taylor's behavior, saying he has "never seen anything like this in five years." *Id.* at 46:53–46:56. Taylor answers: "I can't spit in your car? . . . I'm

saying I just got a lot of phlegm[2] . . . so I spit," mumbling the last words. *Id.* at 46:58–47:05. After that, Dayfield again asks whether Taylor had chewed something up, stating that he had noticed a blue powder. *Id.* at 47:17–47:20. Taylor again shakes his head, saying it was food. *Id.* at 47:24. Dayfield asks Taylor not to spit in his car, and Taylor answers, in an interrupted and strained manner consistent with audible signs of nausea, that he had not spit, he "was talking." *Id.* at 47:53–47:57.

A minute later, while Dayfield is on the phone, Taylor coughs several times. *Id.* at 49:30–49:32. Dayfield twice asks Taylor, "What did you swallow?" to which Taylor responds, "Nothing." *Id.* at 49:30–49:39. Dayfield tells the person on the telephone that he is trying to get a passenger to the jail and that he does not know whether the man had swallowed something. *Id.* at 50:02–50:03. A minute later, Taylor vomits pink fluid through his mouth and nose, which Dayfield notes to the person on the phone but continues to drive. *Id.* at 51:26–52:30. Although this was Taylor's fourth time vomiting, this was the first time it occurred in Dayfield's presence. *See* 29:19–29:26 (first vomit), 39:45–39:48 (second vomit), 44:58–45:00 (third vomit), 51:26–51:33 (fourth vomit). Dayfield and Taylor arrive at the Monroe County Jail approximately 2 minutes later.

While entering the jail sally port, Dayfield asks Taylor again if he had swallowed anything and remarks: "This is for your safety." *Id.* at 53:23–53:24. Once

---

[2] The video transcript says "fun," but upon a close listening, Taylor says "phlegm."

inside the jail sally port, Taylor moves his head closer to the camera, which shows his head appearing shiny, consistent with signs of sweating. *Id.* at 53:36–53:48. Dayfield then opens the passenger door and tells Taylor to wait by the garbage can. *Id.* at 53:49. Taylor sits on the floor by the jail door, approximately six feet from the patrol car's passenger door. ECF No. 24-7 (Exhibit 6)–Caswell Body Camera Video Footage, at 00:17. The jail door opens, and Dayfield asks Taylor once more what he had swallowed, but Taylor says "nothing" one last time. *Id.* at 00:17–00:20. That is his last word.

Video from Monroe County Deputy Caswell's body cam reflects that Taylor then appears to lose consciousness, so Caswell and Deputy Nicholas Arndt move to sit Taylor upright. *Id.* at 00:20–00:43. Caswell then administers a dose of Narcan. *Id.* at 00:43. A second dose follows approximately seventeen seconds later. *Id.* at 01:00. Ten seconds after that, Caswell attempts to administer a third dose, though Arndt notes that it did not go in. *Id.* at 01:10. Deputy Justin Costlow and two officers—who presumably are Lieutenant Chadd Cupp and Sergeant Ryan Miekos––then enter the scene with two unidentified medical personnel carrying medical equipment joined the scene. *Id.* at 01:12–01:22; *see also* ECF No. 24-8 (Exhibit 7)–Costlow Body Camera Video Footage, at 00:00–00:15. At that moment, Taylor begins seizing so the officers roll him over and administer another dose of Narcan. ECF No. 24-7 (Exhibit 6) at 01:28–02:00. Within approximately thirty seconds,

- 6 -

officers call for EMT services, describing Taylor's symptoms. *Id.* at 02:30–02:37. Meanwhile, Taylor continues seizing and vomiting while the officers wait for emergency services. *Id.* at 03:00–03:45.

EMT responders arrive within approximately four minutes after Taylor began seizing. *Id.* at 04:53. They provide medical assistance to Taylor, but he passes away. ECF No. 24-8–Costlow Body Camera Footage at 5:00–8:00.

### B. Procedural History

Almost three years after Taylor's death, on May 13, 2025, Plaintiff Aliysha M. A. Clark, personal representative of Taylor's estate, filed this deliberate indifference action against Dayfield, as well as Arndt, Caswell, Costlow, Cupp, and Miekos ("the Officer Defendants"), Monroe County, and the Monroe County Sheriff's Office (MCSO).[3] *See generally* ECF No. 1. Clark brings four types of claims: (1) deliberate indifference under 42 U.S.C. § 1983 against Dayfield and the Officer Defendants, in violation of the Fourth and Fourteenth Amendments; (2) gross negligence under MICH. COMP. LAWS § 691.1407(2)(c) against Dayfield and the Officer Defendants; (3) *Monell* liability against Monroe County; and (4) failure to intervene against Defendants Miekos and Cupp. *Id.* at PageID.6-16.

---

[3] Clark also sued the State of Michigan and Michigan State Police, but upon stipulation of the Parties, these Defendants—and the counts against them—were dismissed in August 2025. ECF No. 19.

On September 15, 2025, Defendants filed three motions to dismiss. ECF Nos. 24, 25, 26. Dayfield and the deputies—Arndt, Caswell, Miekos, Costlow, and Cupp—make much the same arguments: the complaint improperly lumps them together without specifying what each one did, Clark cannot show deliberate indifference, qualified immunity bars the claim, and Michigan's governmental immunity law shields them because Taylor caused his own death by choosing to swallow a large amount of cocaine. ECF No. 25 at PageID.254–266; ECF No. 26 at PageID.374–389. Monroe County, in a separate motion, argues that the Sheriff's Office cannot be sued as its own entity, that the municipal liability claims fail on every theory Clark advances, and that the County cannot be liable because none of its employees violated Taylor's constitutional rights. ECF No. 24 at PageID.108–123.

## II. LEGAL STANDARD

Under Civil Rule 12(b)(6), a pleading fails to state a claim if its allegations do not support recovery under any recognizable legal theory. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[A] complaint must include only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002) (citing Fed. R. Civ. P. 8(a)(2)). Such a statement must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957).

When considering a Rule 12(b)(6) motion, the court accepts the complaint's factual allegations as true and draws all reasonable inferences in the plaintiff's favor. *See Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008). The plaintiff need not provide "detailed factual allegations" but must provide "more than labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("[A] formulaic recitation of the elements of a cause of action will not do."). To survive a motion to dismiss under Civil Rule 12(b)(6), the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has "facial plausibility" when the plaintiff pleads facts that "allow[] the court to draw the reasonable inference that the [moving party] is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Generally, courts cannot look beyond the pleadings when deciding a motion to dismiss, but courts may consider record documents "referred to in the complaint" and "central to the claims contained therein." *Rondigo, LLC v. Twp. of Richmond*, 641 F.3d 673, 680–81 (6th Cir. 2011) (internal quotation marks and citation omitted); *see also Bell v. City of Springfield*, 37 F.4th 362, 364 (6th Cir. 2022) (holding that courts may consider uncontroverted video evidence at the motion-to-dismiss stage in qualified immunity cases because qualified immunity protects officers from the burdens of suit itself, not merely liability, and delaying its application forfeits that protection for as long as litigation continues).

When, as here, the record contains video of the incident, the court may not adopt a version of the facts "that is 'blatantly contradicted' by video footage." *LaPlante v. City of Battle Creek*, 30 F.4th 572, 578 (6th Cir. 2022) (quoting *Scott v. Harris*, 550 U.S. 372, 378–80 (2007)). But the court "must nonetheless 'view any relevant gaps or uncertainties left by the videos in the light most favorable to the [p]laintiff.'" *Raimey v. City of Niles*, 77 F.4th 441, 447 (6th Cir. 2023) (quoting *LaPlante*, 30 F.4th at 578).

### III. ANALYSIS

### A. 42 U.S.C. § 1983 Claims (Counts I and V)

Under 42 U.S.C. § 1983, a plaintiff may sue any "person" who, under color of state law, subjects any citizen to the deprivation of any rights, privileges, or immunities secured by the Constitution *See* 42 U.S.C. § 1983. To "prevail on a cause of action under § 1983, a plaintiff must prove (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Winkler v. Madison Cnty.*, 893 F.3d 877, 890 (6th Cir. 2018).

"But when a plaintiff pursues a § 1983 claim against an individual government official, the doctrine of qualified immunity shields the individual defendants from [civil] liability if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Scott v. City of Saginaw*, 738 F. Supp. 3d 937, 944 (E.D. Mich. 2024) (quoting (*Getz v. Swoap*,

- 10 -

833 F.3d 646. 652 (6th Cir. 2016)). Qualified immunity provides "breathing room [to officers who] make reasonable but mistaken judgments," and "protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 565 U.S. 535, 546, (2012) (cleaned up) (quoting *Ashcroft v. Al-Kidd*, 563 U.S. 731 (2011)).

Whether an official is entitled to qualified immunity is a two-pronged inquiry. A qualified immunity analysis asks "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." *Harris v. Klare*, 902 F.3d 630, 637 (6th Cir. 2018) (citation modified). These prongs may be addressed in any order. *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013); *see also Pearson v. Callahan*, 555 U.S. 223, 232–36 (2009) (courts may resolve qualified immunity on either prong).

### 1. Fourth Amendment Claim (Count I)

In Count I, Clark alleges that Defendants Dayfield, Arndt, Caswell, Costlow, Cupp, and Miekos were deliberately indifferent to Taylor's serious medical needs in violation of Taylor's Fourth Amendment rights. *See* ECF No. 1 at PageID.6–9. But the right to medical care for individuals in police custody is governed by the Fourteenth Amendment's Due Process Clause, not the Fourth Amendment. *Colson v. City of Alcoa*, 37 F.4th 1182, 1187 (6th Cir. 2022). This is because the Fourth

Amendment governs searches and seizures. A failure to provide medical care is not a search or a seizure. *See id.* at 1188. Thus, as the Sixth Circuit has plainly held: "there is no Fourth Amendment right to medical care." *Id.* at 1189. Accordingly, the Fourth Amendment claim will be dismissed.

### 2. Fourteenth Amendment Claim (Count I)

Also, in Count I, Clark alleges that Defendants Dayfield, Arndt, Caswell, Costlow, Cupp, and Miekos were deliberately indifferent to Taylor's serious medical needs in violation of Taylor's Fourth Amendment rights. *See* ECF No. 1 at PageID.6–9. Dayfield moves to dismiss this claim, arguing that Clark has failed to state a deliberate indifference claim because the complaint lumps all Defendants together and does not specify what Dayfield personally did. ECF No. 25 at PageID.255–62. Dayfield also seeks dismissal of this claim on the basis of qualified immunity, arguing that he did not violate any of Taylor's constitutional rights. *Id.* at PageID.262–63.

Defendants Arndt, Caswell, Miekos, Costlow, and Cupp present similar grounds for dismissal of Clark's deliberate indifference claim, as well as arguing no constitutional violation occurred because they did not encounter Taylor until he had already collapsed, responded within seconds, and secured emergency transport within approximately six minutes. ECF No. 26 at PageID.367–81.

- 12 -

### a. Legal Standard

To prevail on a Fourteenth Amendment deliberate indifference claim, a pretrial detainee must show two things: "(1) that [he] had an objectively serious medical need; and (2) that the defendant either intentionally ignored that need or recklessly failed to take reasonable steps to address it." *Brawner v. Scott Cnty., Tenn.*, 14 F.4th 585, 597 (6th Cir. 2021).

### b. Defendant Dayfield

Dayfield is entitled to qualified immunity because Clark cannot show that Dayfield was deliberately indifferent to Taylor's serious medical need.

### *1. Serious Medical Need*

Clark argues that Taylor's condition—consistent with an overdose—was visible 30 minutes before he reached the jail, 15 minutes before anyone called an ambulance. ECF No. 29 at PageID.466. For the reasons explained below, however, the video evidence compels a different finding.

To satisfy the objective component of a deliberate-indifference claim, a plaintiff must show that his medical need was serious. *Griswold v. Trinity Health Mich.*, 175 F.4th 706, 711 (6th Cir. 2026). A plaintiff can establish seriousness in one of two ways: (1) a physician diagnosed the condition as one requiring treatment; or (2) the condition was so obvious that even a lay person would readily recognize the need for a doctor's attention. *Id.* (citations and quotations omitted). No physician

had previously diagnosed Taylor's condition as one requiring treatment. Therefore, the question is whether his condition was "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (citation omitted).

Vomiting may count as an objective serious medical need. After all, it is a "clear manifestation of internal physical disorder" that would signal to any lay person that something is wrong. *Grote v. Kenton Cnty.*, 85 F.4th 397, 406 (6th Cir. 2023) (citing *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899 (6th Cir. 2004)). But vomiting alone is not always enough.

A recent Sixth Circuit decision sets the baseline. In *Griswold v. Trinity Health Mich.*, the court held that a detainee's need for medical attention was not obvious to a lay person despite having vomiting and sitting in the vomit for 13 hours. 175 F.4th at 712–13.[4] And vomiting was not the only symptom in *Griswold*. There, the detainee appeared lethargic, needed assistance walking, refused to answer questions, was discharged from the hospital with a note that he used narcotics and should return if his condition worsened, and was unresponsive. *Id.* If that constellation of symptoms was not enough to establish an objectively serious medical need, Taylor's condition in Dayfield's car, cannot establish one here either.

---

[4] Even though *Griswold* was decided under the standard set forth in *Farmer v. Brennan*, 511 U.S. 825 (1994), any difference between the tests for convicted prisoners and pretrial detainees is irrelevant here because we apply *Griswold*'s holding to resolve the objective prong, "which applies identically to both categories [of cases]." *Griswold*, 175 F.4th at 710.

- 14 -

The video evidence also contradicts the complaint's version of the events. The complaint alleges that "upon executing the traffic stop, officers noted that Ramonta Taylor was in serious distress and appeared to be suffering from a life-threatening medical emergency." ECF No. 1 at PageID.5. The complaint further alleges that it was "obvious" that Taylor had vomited pink fluid, gasped for air, became unresponsive to voice and touch, began convulsing, showed signs of delusion, and did not respond to Narcan. *Id.* at PageID.7.

But most of these alleged symptoms appeared after Taylor arrived at the jail, not at the traffic stop. Although Taylor vomited four times after swallowing the baggie of cocaine, the first three times were outside of Dayfield's view and the one in his presence occurred only two minutes from the jail. *See Inward Facing Dashcam Video* at 9:00–14:30 (swallowing), 29:19–29:26 (first vomit), 39:45–39:48 (second vomit), 44:58–45:00 (third vomit), 51:26–52:30 (fourth vomit). Even assuming that Dayfield knew, based on the pink stain on his shirt that Taylor had vomited earlier, *Griswold* counsels that this is not enough to establish a serious medical need. *Griswold*, 175 F.4th at 712–13. And it was only after Taylor arrived at the jail and sat next to the jail door that he became unresponsive, began convulsing, and did not respond to Narcan. *See* ECF No. 24-7, Caswell Body Camera Video Footage, at 00:17–00:43 (loss of bodily control); *id.* at 01:28–02:00 (seizing); *id.* at 00:43–01:28 (multiple Narcan doses without response).

- 15 -

In short, the earliest that Taylor's symptoms may have made his medical need obvious to a lay person would have been when Taylor violently vomited pink fluid out of his mouth and nose in front of Dayfield, two minutes before they arrived at the jail. That need became clearly obvious when Taylor collapsed, went unresponsive, and began convulsing on the jail floor.

### 2. Intentional Ignorance or Reckless Disregard

Once Taylor's objectively serious medical need became obvious to any lay person, Dayfield's conduct did not show intentional ignorance nor reckless disregard. The complaint alleges that Dayfield[5] failed to acknowledge Taylor's signs of deterioration and serious medical need, and failed to provide medical care or seek medical assistance that would have saved Taylor's life. ECF No. 1 at PageID.7–8. But the video evidence demonstrates that Dayfield did not intentionally ignore Taylor's need or recklessly disregard it. *See Brawner*, 14 F.4th at 597.

To satisfy this second prong, a plaintiff must show more than negligence but less than subjective intent. *See Brawner*, 14 F.4th at 596. To demonstrate intentional ignorance of a medical need, a plaintiff must show that the official was aware of facts establishing a substantial risk of serious harm, actually drew that inference, and disregarded the risk. *See Farmer*, 511 U.S. at 837. Recklessness, in turn, requires

---

[5] The complaint does not differentiate between the conduct of any of the defendants, but for the purpose of this analysis this Court will construe the allegations as if they were made specifically against Dayfield. ECF No. 1 at PageID.7–8.

showing that the defendant's response was unreasonable considering an unjustifiably high risk to the plaintiff's health or safety, which a reasonable officer in the same position would have recognized. *Brawner*, 14 F.4th at 596–97. Officers generally satisfy that standard by referring health concerns to medical personnel. *Campbell v. Riahi*, 109 F.4th 854, 861 (6th Cir. 2024).

Because the earliest point that Taylor's medical need may have become obvious to a lay person, what matters only is what Dayfield did after that moment. And what Dayfield did was drive Taylor straight to a secure facility staffed with deputies and medical resources. Seconds after they arrived, Taylor collapsed, went unresponsive, and began convulsing on the jail floor in front of Deputies Arndt and Caswell. *See* ECF No. 24-7, *Caswell Body Camera Video Footage*, at 00:17–00:43. Caswell administered a dose of Narcan within seconds, followed by additional doses, and officers called for EMT services within roughly thirty seconds of Taylor's first seizure. *See id.* at 00:43–02:37. Paramedics arrived within four minutes. *See id.* at 04:53.

Dayfield's conduct is consistent with the rule that officers generally satisfy the subjective prong by referring health concerns to medical personnel. *Campbell*, 109 F.4th at 861. On these facts, no reasonable jury could find that Dayfield intentionally ignored, or recklessly disregarded, Taylor's serious medical need.

Moreover, even if Taylor's serious medical need could be deemed to have occurred earlier, Clark still cannot establish that Dayfield intentionally ignored or recklessly disregarded his condition. Before Taylor vomited next to him, Dayfield repeatedly asked Taylor whether he had swallowed something and whether he needed medical attention. *See Inward Facing Dashcam Video* at 30:16–30:44, 31:15, 31:40–31:57, 40:33–40:38, 49:30–49:39, 53:23–53:24. Taylor, presumably hiding the fact that he had ingested an illegal substance, repeatedly denied ever swallowing anything and gave Dayfield a series of innocuous explanations for the vomit: blood from a dental surgery, red pop, spit, and food. *See id.* at 31:15–31:42 (dental surgery), 34:08–34:19 (red pop), 40:15–40:23 (spit), 47:17–47:24 (food). Moreover, based on their conversation in the car, Dayfield clearly viewed Taylor's actions primarily as spitting, rather than vomiting. *See* Inward Dash Cam at 30:16–30:44; 31:40–31:57; 40:10–40:14; 40:39–41:12; 46:53–47:05; 47:53–47:57. Therefore, Clark cannot show that Dayfield actually drew the inference of substantial risk prior to the only time when Taylor vomited next to Dayfield. Especially when the detainee himself denied any risk existed, offered benign explanations for every symptom, and self-characterized his vomiting as simply spitting. *See Farmer*, 511 U.S. at 837. And neither can Taylor show that Dayfield's response was reckless. Even if Dayfield misjudged how sick Taylor was on the drive to the jail, "[m]ere negligence is insufficient." *Brawner*, 14 F.4th at 596.

- 18 -

In sum, Clark cannot show that Dayfield intentionally disregarded the risk to Taylor's health, nor that he recklessly disregarded it. Thus, since Dayfield did not violate Taylor's Fourteenth Amendment rights, he is entitled to qualified immunity under the first prong.

### 3. Clearly Established Right

The clearly established inquiry is moot because this Court has already held that no constitutional violation occurred. *See Pearson*, 555 U.S. at 236 (2009) (courts may resolve qualified immunity on either prong). But even if the inquiry were not moot, none of the cases that Clark cites would have told a reasonable officer in Dayfield's position that his conduct was unconstitutional.

"A right is clearly established when it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam) (internal quotation marks and citation omitted)); *see also District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018).

Clark relies principally on *Burwell v. City of Lansing*, 7 F.4th 456 (6th Cir. 2021), where the detainee showed clear signs of distress for nearly 40 minutes and then lay motionless in his own vomit for two hours. *Id.* at 460–62. Taylor's facts are far less severe, and the Sixth Circuit in *Griswold* held that the *Burwell* case did not

clearly establish the right even for a detainee whose facts were closer to *Burwell's* than Taylor's are here. *See Griswold*, 175 F.4th 706.

Clark's remaining authorities fail for independent reasons. *Speers v. County of Berrien*, 196 F. App'x 390 (6th Cir. 2006), is unpublished and so cannot establish clearly established law. *See Bell v. City of Southfield*, 37 F.4th 362, 367 (6th Cir. 2022) ("[A] plaintiff cannot point to unpublished decisions to meet this burden."). And *Heeter v. Bowers*, 99 F.4th 900 (6th Cir. 2024), postdates Taylor's death and so cannot supply the notice qualified immunity requires. *See Lawler v. Hardeman Cnty.*, 93 F.4th 919, 926 (6th Cir. 2024) (courts evaluating a qualified-immunity defense may not consider legal rules adopted by later caselaw). In short, none of the cases Clark cites would have put a reasonable officer on notice that Taylor had an obvious need for medical care before he became unresponsive and began seizing on the jail floor. Dayfield, therefore, would be entitled to qualified immunity on this prong as well.

Thus, Clark's claims against Dayfield for deliberate indifference under the Fourteenth Amendment (Count I) will be dismissed.

### c. Defendants Arndt, Caswell, Costlow, Cupp, and Meikos

Officer Defendants—Arndt, Caswell, Costlow, Cupp, and Meikos—are also entitled to qualified immunity because they were not deliberately indifferent to Taylor's serious medical need.[6]

Clark alleges that upon Taylor's arrival at the Monroe County Jail, the Officer Defendants "unceremoniously dumped Mr. Taylor onto the intake bay floor, where he continued to convulse and was non-responsive to verbal commands." ECF No. 1 at PageID.5. Clark asserts that rather than immediately rendering medical assistance, the Officer Defendants debated "whether to search Taylor's person first or provide medical attention." *Id.* Clark further alleges that the Officer Defendants attempted to administer Narcan to Taylor on four separate occasions, knowing—or having reason to know—that "it would not be effective under the known circumstances," and that for "many minutes" none of them called for an ambulance or provided any other form of appropriate medical assistance. *Id.* at PageID.5–6.

The Officer Defendants, for their part, argue that the body camera footage blatantly contradicts Clark's characterization of events, and that the footage shows

---

[6] A § 1983 plaintiff must show that each defendant, through his own individual actions, violated the Constitution and must allege with particularity what each defendant did. *See Lanman v. Hinson*, 529 F.3d 673, 684 (6th Cir. 2008); *see also Warman v. Mount St. Joseph Univ.*, 144 F.4th 880, 898 (6th Cir. 2025). Clark's complaint does not meet that standard as to each individual Officer Defendants. But the defect is immaterial here because as explained within, qualified immunity applies to each of them even treating every allegation as if it applied to each one individually.

that the Officer Defendants responded promptly and actively to Taylor's medical emergency upon his arrival at the jail. ECF No. 26 at PageID.374–78.

Recall, to prevail on a deliberate indifference claim, "[a] pretrial detainee must prove more than negligence." *Brawner*, 14 F.4th at 596. Specifically, a defendant must have either acted intentionally to ignore the plaintiff's serious medical need or recklessly failed to act reasonably to mitigate the risk that the serious medical need posed, even though a reasonable official in the defendant's position would have known that the condition posed an excessive risk to the plaintiff's health or safety. *See id.*

Here, the video evidence does not align with the facts alleged in the complaint with respect to the Officer Defendants. *See* ECF No. 24-6-Officer Arndt Bodycam Footage. What the body camera footage reveals is a brief but active response by the Officer Defendants. Far from ignoring Taylor's serious medical need, the Officer Defendants immediately administered Narcan on multiple occasions,[7] called for emergency medical services, and actively attended to Taylor while awaiting the

---

[7] To the extent that the administration of Narcan may not have been the most medically appropriate intervention, this falls short of the deliberate indifference standard because it is, at most, negligence, and perhaps not even that, as administering Narcan to a person presenting overdose symptoms is precisely what a reasonable officer in that position would do. *See Smith v. Cnty. of Lenawee*, 505 Fed. Appx. 526, 533–34 (6th Cir. 2012) (unpublished) (finding no deliberate indifference even though officer failed to summon an ambulance for detainee suffering from *delirium tremens*).

arrival of EMT. *See* ECF No. 24-7 (Exhibit 6)Caswell Body Camera Video Footage, at 00:43–02:00 (administering multiple doses of Narcan), 02:30–02:37 (calling for emergency medical services), 03:00–04:53 (attending to Taylor while emergency services were en route).

The body camera footage does not show that the Officer Defendants intentionally ignored Taylor's serious medical need, nor that they recklessly failed to act reasonably to mitigate the risk that Taylor's condition posed to his health and safety. To the contrary, the footage shows officers who responded promptly, administered available medical interventions, summoned emergency services, and waited with Taylor until help arrived. *See id.*

The evidence, therefore, does not plausibly support a finding of deliberate indifference as to any of the Officer Defendants. And because no constitutional violation has been established, Deputies Arndt, Caswell, and Costlow, and supervisors Miekos and Cupp are entitled to qualified immunity. Thus, Clark's claims against them for deliberate indifference under the Fourteenth Amendment (Count I) will be dismissed. Further, because no constitutional violation occurred, Clark's failure-to-intervene claim (Count V) will also be dismissed. *See Greene v. Crawford Cnty.*, 22 F.4th 593, 615 (6th Cir. 2022) (a failure-to-intervene claim requires an "underlying constitutional violation").

- 23 -

## B. *Monell* Claim (Count IV)

Clark brings a *Monell* claim against Monroe County and the Monroe County Sheriff's Office. ECF No. 1 at PageID.12–14. She alleges that Taylor's constitutional deprivations flowed from the County's policies, customs, and practices. Specifically, she says Taylor's death was caused by either applying or not following the Sheriff's Office policy on handling overdoses. *Id.* She also alleges that the Sheriff's Office failed to train, supervise, instruct, and monitor its officers. *Id.*[8]

*Monell* holds that a municipality is a "person" subject to § 1983 liability, but only for its own official policies that cause a constitutional violation — not for the acts of its employees on a *respondeat superior* theory. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). It follows that a municipality cannot be liable when its officers committed no constitutional violation at all. *See Roell v. Hamilton Cnty.*, 870 F.3d 471, 487 (6th Cir. 2017); *see also Davenport v. Causey*, 521 F.3d 544, 554 (6th Cir. 2008).

That is the case here. As this Court has found, none of the Monroe County defendants—Deputies Arndt, Caswell, and Costlow, or supervisors Miekos and Cupp—violated Taylor's clearly established constitutional rights. Therefore,

---

[8] Clark also alleges that the Monroe County Sheriff's Office "failed to discipline officers for violations of policy related to excessive force," ECF No. 1 at PageID.14, but Clark has not brought an excessive force claim against Defendants, so those allegations appear to be misplaced.

Monroe County[9] and the Monroe County Sheriff's Office[10] cannot be held liable either. *See Davenport v. Causey*, 521 F.3d 544, 554 (6th Cir. 2008) (holding that the city was not liable because the court held no constitutional violations occurred). Therefore, the *Monell* claim will be dismissed.

## C. Gross Negligence (Count II)

A district court may decline supplemental jurisdiction over related state claims for reasons listed in 28 U.S.C. § 1367(c). *See Williams v. Addison Community Schools*, 168 F.4th 791, 796 (6th Cir. 2026). One such reason is that all claims over which the court has original jurisdiction have been dismissed. 28 U.S.C. § 1367(c)(3). When all federal-law claims drop out before trial, the balance of judicial economy, convenience, fairness, and comity usually favors declining jurisdiction over the remaining state-law claims. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S.

---

[9] The claim against Monroe County could also be dismissed on procedural grounds. Specifically, Clark did not respond to Monroe County's motion to dismiss her municipal claims, *see* ECF No. 30, and that failure waives her opportunity to challenge the motion. *See Humphrey v. U.S. Att'y Gen. Off.*, 279 F. App'x 328, 331 (6th Cir. 2008) (failure to oppose a motion to dismiss waives the arguments not raised); *Meeks v. Larsen*, 999 F. Supp. 2d 968, 975 (E.D. Mich. 2014), *aff'd*, 611 F. App'x 277 (6th Cir. 2015) (failure to respond waives the claims raised in the motion).

[10] Clark's claims against the Monroe County Sheriff's Office also fail for an independent reason: a county sheriff's department is not a legal entity that can be sued under § 1983, because it is a subdivision of the county rather than a separate juridical entity. *See Rhodes v. McDannel*, 945 F.2d 117, 120 (6th Cir. 1991); *North v. Macomb Cnty.*, No. 10-11377, 2011 U.S. Dist. LEXIS 112584, at *7–8 (E.D. Mich. Sept. 30, 2011); *Danich v. Naphcare Inc.*, No. 25-cv-10731, 2026 U.S. Dist. LEXIS 67704, at *8–9 (E.D. Mich. Mar. 30, 2026).

343, 350 n.7 (1988). That is the situation here. The case is at the pleading stage, so the litigation is in its earliest phase; there is no diversity jurisdiction; and all federal claims will be dismissed. The Court therefore declines to exercise supplemental jurisdiction over Clark's gross-negligence claim.

### IV. CONCLUSION

Accordingly, it is **ORDERED** that Defendants' Motions to Dismiss, ECF Nos. 24; 25; 26, are **GRANTED**, thereby **DISMISSING** Counts I and III–V (federal claims) **WITH PREJUDICE**, ECF No. 1, and this case.

**IT IS FURTHER ORDERED** that this Court **DECLINES TO EXERCISE JURISDICTION** over Count II (state-law claim).

**This is a final order that closes this case.**

*/s/ Susan K. DeClercq*
SUSAN K. DECLERCQ
United States District Judge

Dated: June 30, 2026